UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                          Plaintiff,

        v.

DONNIE LEE JACKSON,

                      Defendant.

_____

                              <u>REPORT & RECOMMENDATION</u>

                              19-CR-6026CJS

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated February 21, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 32).

On February 21, 2019, the grand jury returned a one-count indictment against defendant Donnie Lee Jackson ("Jackson") charging him with possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2).  (Docket # 30).  The indictment alleges that he is subject to enhanced penalties if convicted by virtue of his prior conviction "under the laws of the State of New York relating to aggravated sexual abuse, sexual abuse, and abusive sexual conduct involving a minor or ward."  (*Id.*).  Currently pending before the Court is Jackson's motion to suppress evidence and statements.  (Docket # 38).[1]

---

[1] Jackson's omnibus motions also sought, *inter alia*, discovery and inspection, disclosure of Rule 404, 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 38). Each of the motions was decided by the undersigned or resolved by the parties in open court on June 13, 2019. (Docket # 49).

On June 13, 2019, this Court held an evidentiary hearing on the suppression motion, at which the government called New York State Department of Corrections and Community Supervision ("DOCCS") Parole Officer Raymond Diamond ("Diamond") to testify. (Docket ## 48, 49).  After reviewing the parties' post-hearing submissions (Docket ## 54, 56), the Court entertained further oral argument on October 9, 2019.  (Docket # 57).  At that argument, the government contended that suppression of evidence was not warranted under the doctrine of inevitable discovery, an alternative theory not previously relied upon by the government.  (Docket # 61).  The Court held a further evidentiary hearing on November 20, 2019, on the issue of inevitable discovery, at which the government elicited testimony from Diamond and Chris Harrington ("Harrington"), an investigator with the Monroe County Sheriff's Office.  (Docket # 66).  The government and the defense filed supplemental post-hearing submissions on January 6 and January 8, 2020, respectively.  (Docket ## 68, 69).

For the reasons discussed below, I recommend that the district court grant Jackson's motion to suppress statements and deny his motion to suppress evidence.

## FACTUAL BACKGROUND

The hearing testimony is summarized below.  (Docket ## 51, 66).

### I.    Testimony of Parole Officer Diamond

Diamond testified that he has worked as a parole officer for DOCCS for approximately thirteen years.  (Tr. A 8)[2].  Diamond became Jackson's supervisory parole officer upon Jackson's release from prison on March 15, 2017.  (Tr. A 9, 12).  Diamond acknowledged that he knew the nature of the charges on which Jackson had been convicted (Tr. A 56);

---

[2]  The transcript of the June 13, 2019 hearing shall be referred to as "Tr. A___," and the transcript of the November 20, 2019 hearing shall be referred to as "Tr. B __."  (Docket ## 51, 66).

specifically, he had been convicted of sexual abuse in the 1ˢᵗ degree, a New York State felony, evidently involving a minor.  (Docket # 30; Government's Exhibit ("G. Ex.") 1).

 Prior to Jackson's parole release, he was required to agree to standard release conditions imposed by the Board of Parole.  (Tr. A 9-10, 71-72; G. Ex. 1).  As a condition of his release, Jackson agreed to permit his parole officer to visit his residence or place of employment, and to permit the search and inspection of his person, residence, and property.  (Tr. A 9-10, 18, 37-38; G. Ex. 1).  As part of those standard conditions, Jackson agreed to abide by any special release conditions imposed by his parole officer.  (Tr. A 71-72; G. Ex. 1).

 Jackson met with Diamond on March 16, 2017, and reviewed with him both the standard release conditions and special conditions imposed by Diamond.  (Tr. A 12-14, 16; G. Exs. 1, 2).  Those release conditions permitted Jackson to possess and use only one cellular phone: a single, flip-style phone with a disabled camera and no internet connectivity.  (Tr. A 17-18; G. Ex. 2).  Other special release conditions prohibited Jackson from, among other things, having any unapproved contact with minors and from being within 300 yards of "places where children congregate."  (G. Ex. 2).

 After release, Jackson lived in a house with his grandmother and a female roommate.  (Tr. A 20, 39-40).  Jackson's grandmother's bedroom was located downstairs, and his own bedroom and his roommate's bedroom were located upstairs.  (Tr. A 21-22, 40, 42).  Diamond testified that he conducted semimonthly unannounced home visits in order to supervise Jackson and ensure that he was complying with his release conditions.  (Tr. A 18-19).

 Diamond testified that he had searched Jackson's residence on at least one occasion before his May 7, 2018 arrest and had followed his usual practice.  (Tr. A 20).  Specifically, he testified that his general practice was to handcuff the parolee prior to the search

for officer safety purposes. (Tr. A 19). According to Diamond, he also customarily advised the parolee that he was not under arrest but that the handcuffs were required by policy and would be removed after the search. (Tr. A 19).

On April 2, 2018, Diamond went to Jackson's home to conduct a supervisory visit. (Tr. A 21, 39). Diamond testified that, after he knocked, he heard running and heavy footsteps on the stairs and noted that Jackson took longer than usual to answer the door. (Tr. A 21, 39). According to Diamond, when he finally did answer, Jackson appeared to be feigning that he had just woken up. (Tr. A 21, 39). During his subsequent interaction with Jackson, which included a search of Jackson's bedroom, Diamond observed that Jackson exhibited unusual behavior, including appearing "worried about something, about [Diamond's] presence." (Tr. A 22). At some point during the bedroom search, Jackson's roommate came out of her room, entered Jackson's bedroom, sat on his bed, and then left the room. (Tr. A 21, 41). Diamond testified that Jackson's roommate had never before been present in Jackson's room on any home visit by Diamond. (Tr. A 21). Diamond testified that he thought the roommate's behavior was odd and suspected that she was "complicit in helping [Jackson] hide a piece of electronic equipment." (Tr. A 21, 27). Although Diamond did not uncover anything during the search of Jackson's room, Diamond made arrangements for Jackson to submit to a polygraph examination. (Tr. A 22-23, 41-42).

The polygraph examination was conducted on April 17, 2018, and Diamond received a report of the examination results. (Tr. A 23; G. Ex. 3). According to the report, Jackson was deceptive when answering three questions, including a question regarding whether he had viewed pornography or sexually explicit material since his last examination. (Tr. A 23-25, 51-53; G. Ex. 3). The report also noted that Jackson told the examiner that Diamond had

showed him a nude image when demonstrating how an iPad could connect to the internet; Diamond testified that he had not and "would not have shown a sex offender a nude image." (Tr. A 51).  Diamond testified that the report of the polygraph examination caused him concern whether Jackson was accessing pornography on the internet through the use of an unapproved electronic device.  (Tr. A 25-26, 46).

Diamond met with Jackson at his home on May 3, 2018 to discuss the results of the polygraph.  (Tr. A 26).  Jackson denied being dishonest during the examination and maintained that the evaluator had misrepresented Jackson's statements.  (Tr. A 26-27).  After consulting with his supervisor and in view of his belief that Jackson's roommate was assisting him in secreting an electronic device, Diamond decided to search Jackson outside his residence. (Tr. A 27, 53).

On May 7, 2018, Diamond arrived at Jackson's residence before Jackson was expected to return from work.  (Tr. A 27-28, 53).  Diamond and Parole Officer Mark Saben ("Saben") waited in Diamond's vehicle.  (Tr. A 27-28).  When Jackson drove up and began to park in front of his house, Diamond pulled up behind him and observed Jackson reach down towards the bottom of the driver's seat; Diamond then moved his vehicle across the street and parked parallel to Jackson's vehicle.  (Tr. A 28-29, 54-55, 71).  Diamond and Saben exited their vehicle.  (Tr. A 29, 54).

Diamond directed Jackson to get out of his vehicle and to place his hands behind his back.  (Tr. A 29).  Diamond handcuffed him and told Jackson that he was not under arrest but that Diamond was going to search him and his car.  (Tr. A 29, 54).  After a pat-search, Jackson was escorted by Diamond towards the rear of the vehicle; Saben reached under the driver's seat and retrieved a cellphone (the "unapproved phone"), which he handed to Diamond.  (Tr. A

5

29-30, 55-56, 65; G. Exs. 4, 5). Diamond asked Jackson to whom the phone belonged, and Jackson responded that it was his roommate's. (Tr. A 31, 57). Diamond replied that he did not believe Jackson. (Tr. A 58).

Diamond placed Jackson in the back of Diamond's vehicle and sat in the driver's seat as Saben completed the search of Jackson's vehicle. (Tr. A 31, 65). Jackson's approved cellphone was located in the console of his car. (Tr. A 31). Diamond questioned Jackson about the unapproved phone, and Saben joined them in Diamond's car after he had finished searching Jackson's car. (Tr. A 31, 65). According to Diamond, the rear doors of his vehicle were locked, preventing Jackson from exiting the vehicle. (Tr. A 65-66). Diamond testified that although Jackson was not free to leave, he did not provide *Miranda* warnings prior to questioning Jackson because he was investigating a parole violation and not a crime. (Tr. A 31-32, 56, 65).

Diamond asked Jackson for the code to unlock the unapproved phone, and Jackson replied that it was not his phone. (Tr. A 58-59). Although the phone was locked, Diamond was able to access its electronic wallet and observed a shopper's club card with Jackson's name on it. (Tr. A 59-61). Diamond confronted Jackson with this information, and Jackson admitted that the unapproved phone was his and could be unlocked using facial recognition. (Tr. A 32-33, 61-62). Diamond instructed Jackson to lean forward and look into the phone, which he did. (Tr. A 32-33, 62-63). The phone unlocked, and Diamond asked Jackson for the numeric passcode in the event the phone locked again. (Tr. A 32-33, 63). Jackson provided the passcode, which Diamond recorded on a piece of paper. (Tr. A 33-34, 63).

Diamond began to scroll through the contents of the unapproved phone. (Tr. A 63). He first noticed that the phone had social media applications for Facebook and Snapchat, which were prohibited by Jackson's release conditions. (Tr. A 34, 67). Diamond asked why

Jackson had the prohibited applications on the phone, and Jackson responded that he just wanted to live his life. (Tr. A 36, 69-70). In the photo gallery of the phone, Diamond observed sexually explicit images and videos, both of which were prohibited by Jackson's release conditions. (Tr. A 34). One of the videos and some of the photographs depicted the defendant engaging in sexual acts with a person whom Diamond suspected was a minor. (Tr. A 34-35, 66-67). Diamond asked Jackson the age of the individual, and Jackson responded that he was an adult. (Tr. A 34). Diamond acknowledged that, based upon the "questionable age" of the other individual in the video and photographs, criminal charges were potentially "forthcoming." (Tr. A 35).

Diamond called his supervisor and requested authorization for a parole violation warrant for Jackson's arrest. (Tr. A 34-35, 70). Jackson was arrested. (Tr. A 35). Diamond turned off the unapproved phone and later placed it in a sealed evidence bag in his evidence locker at his office. (Tr. A 35). He subsequently provided the unapproved phone to Harrington and requested that Harrington conduct a forensic examination of its contents. (Tr. A 35).

At the November hearing, Diamond testified that Parole Department policy authorizes the seizure of property from a parolee if it is "rationally related to [his] duties as a parole officer in [his] official capacity to investigate any criminal or violative behavior." (Tr. B at 7-10). According to Diamond, this policy affords him discretion to determine whether to seize contraband he observes during the course of his duties. (Tr. B 11-12). He explained that because the individuals he supervises are sex offenders he seizes every unapproved cellphone that he observes in the possession of any of his parolees. (Tr. B 12-13). He then decides whether to request a forensic search of the phone. (Tr. B 15). If he does, he provides the phone and any SD card in it to Harrington to examine. (Tr. B 14-15). If he has information about what

might be found on the phone, Diamond may give specific instructions to Harrington regarding the search.  (Tr. B 16-17).  In this case, Diamond asked Harrington to look for social media accounts.  (Tr. B 16).  Otherwise, he asks Harrington to perform a general search of the phone so that Diamond may review its contents.  (Tr. B. 16-17).

Diamond testified that even if he had been unable to access Jackson's unauthorized phone on May 7, 2018, he would have seized it because its possession alone constituted a violation of Jackson's release conditions.  (Tr. B 5-6).  Diamond also testified that he would have provided it to Harrington and requested that he attempt to access and search its contents.  (Tr. B 5-7).

## II.    <u>Testimony of Investigator Chris Harrington</u>

Harrington testified that he has been an employee of the Monroe County Sheriff's Office for approximately seventeen years; for the past six years, his work has focused on "digital forensics," including searching seized digital devices at the request of parole officers.  (Tr. B 20, 28).  In this case, at Diamond's request, he conducted a search of the unapproved phone, a Samsung Galaxy phone, on May 10, 2018.  (Tr. B 21).  Diamond asked him to search the phone for evidence of Facebook accounts and their possible use to obtain nude photographs of minors. (Tr. B 21, 35).  Harrington testified that he would have performed the same search irrespective of the directions received from Diamond.  (Tr. B 43).  He explained that he would have searched the phone for pornography, including child pornography, because he knew that Diamond supervised sex offenders.  (Tr. B 43).

Although Diamond provided Harrington with the passcode for the phone, Harrington did not need it because the passcode function had already been removed from the

phone, permitting it to be opened with a swipe of the screen. (Tr. B 21-22). Harrington testified that he used search software provided by a company named Cellebrite. (Tr. B 22-23). According to Harrington, Cellebrite software enables him to access Android phones, like Jackson's unapproved phone, whether or not they are locked with a passcode. (Tr. B 23-24, 30-31). Harrington testified that he has successfully accessed approximately ten Android phones of the same model as the one provided by Diamond, although he did not know whether the Cellebrite software had that capability in May 2018. (Tr. B 30-33, 40-41). According to Harrington, even in instances in which the software does not provide access to a particular Android model, software updates that do so are generally available within six months. (Tr. B 30, 32, 41). In other words, he testified, even if he had been unable to access Jackson's phone on May 10, 2018 because it had been locked by a passcode, he would have been able to access it eventually. (Tr. B 24, 30-32, 41). Harrington stated that the Cellebrite software available at the time of the hearing had the capability to unlock Jackson's Android model phone. (Tr. B 31-33, 40).

Harrington testified that he successfully extracted the entire contents of the unapproved phone. (Tr. B 24-25). He described generally the process by which he did so. (Tr. B 35). Harrington did not discover any incriminating evidence on the cellphone. (Tr. B 26).

Harrington also obtained and examined the contents of the micro SD card located under the back cover of the phone. (Tr. B. 24-25). Harrington testified that it was his practice to examine any SD card located in a device he had been asked to examine and explained that he would have been able to access the contents of the SD card in the unapproved phone even if the phone had been locked with a passcode. (Tr. B 24-26). In this case, Harrington created a forensic copy of the SD card's contents and identified images of suspected child pornography

9

and videos that had been deleted.  (Tr. B 25-26).  According to Harrington, he would have

performed the same examination of the SD card whether or not Diamond had instructed him to

look for Facebook-related content.  (Tr. B. 43).


### III.    DOCCS Search and Seizure Directive

In further support of its opposition to Jackson's motion to suppress, the

government submitted DOCCS Directive No. 9404, entitled Search and Seizure, which outlines a

parole officer's authority to search and seize property.[3]  (Docket # 69-1).  According to the

directive, a parole officer has the authority to conduct a warrantless search of a parolee or his

property, including his vehicle, if the parole officer has "an articulable reason for the search, and

when the search is reasonably related to the performance of [the officer's] duties."  (*Id.* at

§ IV(B)(4)(a)).  The directive instructs parole officers concerning the disposition of seized

property that is or may be evidence of a crime or evidence of a violation of parole.  (*Id.* at

§ IV(D)(2)(a)-(c)).


### IV.    Jackson's Affidavit

In support of his suppression motion, Jackson submitted an affidavit regarding his

May 7, 2018 interaction with Diamond.[4]  (Docket # 44).  In the affidavit, Jackson alleges that

after getting out of his car the parole officers placed him in handcuffs and searched his person

---

[3]  Jackson requested this directive during the November 20, 2019 hearing.  (Tr. B at 9, 18).  On January 8, 2020, the government attached the directive to its post-hearing submission.  (Docket # 69-1).  Jackson has not requested leave to examine Diamond regarding the directive or address it in a supplemental written submission.

[4]  Jackson's affidavit also addressed statements he allegedly made on June 11, 2018.  (Docket # 44 at ¶ 7). The government has represented that it will not seek to introduce these statements in its case-in-chief.  (Tr. A at 4). Accordingly, the portion of Jackson's motion that seeks suppression of those statements should be denied as moot. (Docket # 38 at ¶ 23; Tr. A at 4).

and vehicle.  (*Id.* at ¶ 4).  Jackson maintains that the officers also asked him questions regarding a cellphone they found in his vehicle without advising him of his *Miranda* rights.  (*Id.* at ¶ 5). According to Jackson, he did not agree to speak to the officers, nor did he give them permission to search his person, vehicle, or cellphone.  (*Id.* at ¶ 6).

## DISCUSSION

Jackson seeks suppression of his statements and tangible evidence on several grounds.  (Docket ## 38, 54, 68).  With respect to his statements, Jackson maintains that they were elicited in violation of *Miranda*.  (Docket ## 38 at ¶¶ 23-28; 54 at 12-14).  He also maintains that his statements were the fruit of the unlawful search of his car and cellphone. (Docket # 54 at 13).  With respect to tangible evidence, Jackson maintains that the parole officers lacked reasonable suspicion to search his vehicle and the unapproved phone discovered in his vehicle.  (Docket ## 38 at ¶¶ 13-17; 54 at 6-8).  He also maintains that the officers violated his Fourth and Fifth Amendment rights when they compelled him to offer his face to unlock the unapproved phone and to provide its passcode.  (Docket ## 38 at ¶¶ 18-22; 54 at 8-12).

The government counters that *Miranda* warnings were not required because Jackson was not in custody when the statements were made.  (Docket ## 47 at 6-7; 56 at 13-16). It also maintains that the officers conducted a permissible warrantless search of Jackson's vehicle and phone based upon reasonable suspicion that a parole violation had occurred and that the compelled use of Jackson's facial features to unlock the cellphone did not violate the Fourth Amendment.  (Docket ## 47 at 2-6; 56 at 7-12).  The government further reasons that the Fifth Amendment is not implicated where, as here, a phone is unlocked through facial recognition software.  (Docket ## 47 at 6; 56 at 12-13).  In the government's view, even if Jackson's

constitutional rights had been violated by the manner in which the parole officers accessed the unapproved phone, suppression would not be justified because the officers would have inevitably accessed and searched the phone's content.  (Docket # 69).

I.    **Suppression of Statements**

Jackson contends that his statements were obtained in violation of the Fifth Amendment because he was subjected to custodial interrogation without being advised of or validly waiving his *Miranda* rights.  (Docket ## 38 at ¶¶ 23-28; 54 at 12-14).  The record makes clear that Jackson was not advised of his *Miranda* rights prior to being interrogated by Diamond and Saben on May 7, 2018.  (Docket # 47 at 6-7).  As the government acknowledges, the salient question is whether Jackson was in custody at the time of the questioning.[5]  (Docket # 56 at 13-15).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then

---

[5] The government does not appear to contest that Diamond's questioning of Jackson concerning his possession and use of the unapproved cellphone constituted interrogation within the meaning of the Fifth Amendment.  That assumed concession makes sense in light of the fact that Diamond knew that Jackson had been convicted of sexual abuse involving a minor, had been found to have been deceptive in responding to a polygraph question concerning whether he had viewed sexually explicit images, and had apparently possessed and concealed an unapproved cellphone.  Under these circumstances, Diamond's questions, although they pertained to possible violations of his parole conditions, also pertained to "potentially incriminating activities."  *See United States v. Faux*, 828 F.3d 130, 134-35 (2d Cir. 2016) ("it is undisputed that the questioning constituted an 'interrogation' because the agents expressly questioned [the defendant] about potentially incriminating activities").

voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

In determining whether a defendant was in custody, a court must undertake a two-part analysis. *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1467 (2019). First, the court must ask whether "a reasonable person in the defendant's position would have understood that he or she was free to leave." *Id.*; *see United States v. Newton*, 369 F.3d 659, 672 (2d Cir.), *cert. denied*, 125 S. Ct. 371 (2004). If the answer is affirmative, the inquiry concludes. *United States v. Newton*, 369 F.3d at 672. If, however, the reasonable person would not have felt free to leave, the court must then proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, "there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d at 60.

"Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Newton*, 369 F.3d at 672 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave"). Thus, "[a]lthough

13

both elements are required, the second is the ultimate inquiry because a free-to-leave inquiry

reveals only whether the person questioned was seized[,] . . . a necessary, but not sufficient,

condition [of custody]." *United States v. Faux*, 828 F.3d at 135 (internal quotations omitted).

Considerations relevant to the second inquiry include "whether the suspect [was] told that he or

she is free to leave, the location and atmosphere of the interrogation, the language and tone used

by the law enforcement officers, whether the subject [was] searched or frisked, and the length of

the interrogation." *Santillan*, 902 F.3d at 60.

       Diamond's credible testimony demonstrates that he handcuffed Jackson, told him

that he was not under arrest but that the officers intended to conduct a search of his vehicle, and

conducted a pat-frisk of his person.  After Saben located the unapproved phone under the

driver's seat of Jackson's car, Diamond confronted Jackson with the phone, and Jackson denied

it belonged to him.  Diamond placed him in the back of his vehicle while Saben completed the

search of Jackson's vehicle.  When it had been completed, the officers began to question Jackson

about the phone.

       On the record before the Court, I find that Jackson was in custody at the time he

was questioned by the officers.  Although the interaction was relatively brief, and Jackson was

advised that he was not under arrest, he was intercepted by his supervising parole officer outside

his home in a non-routine encounter days after being confronted by that officer concerning

allegedly deceptive responses during a polygraph examination about viewing sexually explicit

material; Jackson was handcuffed, placed in the locked back seat of his parole officer's vehicle,

and confronted with an unauthorized phone taken from under the front seat of the car he had

been driving moments before – the possession of which violated the conditions of his release.

Under these circumstances, a reasonable person in Jackson's position would have understood

that he was not free to leave and that his freedom of movement was restrained to a degree akin to

a formal arrest.  *See*, *e.g.*, *Newton*, 369 F.3d at 677 (handcuffed parolee was in custody during

search of his residence despite being informed that he was not under arrest); *United States v.*

*Santalucia*, 666 F. Supp. 2d 268, 273 (N.D.N.Y. 2009) (handcuffed parolee was in custody

during search of his room); *see also United States v. Hemphill*, 2010 WL 3366137, *6

(S.D. Ohio 2010) (parolee was in custody when he was placed in handcuffs during unannounced

visit and search of his residence).  Indeed, Diamond himself acknowledged that Jackson was not

free to leave and that he requested a warrant for Jackson's arrest based upon his possession of the

unapproved phone immediately after he had concluded the questioning.

        The facts of this case are strikingly similar to the facts before the court in *United*

*States v. Newton*, 369 F.3d 659 (2d Cir. 2004), upon which the government puts significant but

misplaced reliance.  (*See* Docket ## 47 at 7; 56 at 13-14).  In *Newton*, the parolee defendant was

handcuffed during a parole search of his mother's residence and, like Jackson, was specifically

told that he was not under arrest and that the handcuffs were merely for safety purposes.  *Id.* at

676.  Further, the defendant in *Newton*, like Jackson, "was accustomed to parole officers coming

to his home to ask questions in connection with his supervision."  *Id.* at 675.  The Second Circuit

in *Newton* nonetheless found that the defendant was in custody for purposes of *Miranda*.  *Id.* at

677.  As the court reasoned:

> Neither can we assume an understanding [by the parolee] that
> removal or maintenance of the handcuffs depended on the outcome
> of the search rather than on the suspect's responding to questions
> posed.  Because *Miranda*'s safeguards "become applicable as soon
> as a suspect's freedom of action is curtailed to a degree associated
> with formal arrest," *Berkemer v. McCarty*, 468 U.S. 420, 440
> (1984) (internal quotation marks omitted), we must conclude that
> handcuffing Newton, though reasonable to the officers'
> investigatory purpose under the Fourth Amendment, nevertheless
> placed him in custody for purposes of *Miranda*.

(*Id.*).  I likewise conclude that under the totality of the circumstances Jackson was in custody at the time he made statements to the parole officers.  Accordingly, I recommend that the district court grant Jackson's motion to suppress those statements.[6]

## II.   Suppression of Evidence

Next, I turn to Jackson's motion to suppress evidence.  (Docket ## 38 at 5-9; 54 at 6-12; 68).  Jackson challenges the officers' search of his vehicle and the unapproved phone on the grounds that they were unsupported by reasonable suspicion.  Additionally, Jackson maintains that even if reasonable suspicion existed to search the vehicle and seize the phone, Diamond violated Jackson's constitutional rights by requiring him to unlock the phone with the use of his face and to provide the passcode.

### A.   Search of the Vehicle and Unapproved Phone

The Fourth Amendment to the United States Constitution protects all citizens from unreasonable government intrusions into areas in which they have a reasonable expectation of privacy.  U.S. Const. amend IV.  "[W]hether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)).  To determine whether a defendant possessed a reasonable expectation of privacy, the court must first consider whether the defendant exhibited an actual expectation of privacy and, second, whether that expectation is one that society is prepared to

---

[6] Because I conclude that Jackson's statements should be suppressed due to the *Miranda* violation, I need not address Jackson's contention that the statements were the fruit of the unlawful search of his car and phone. (Docket # 54 at 12-13).

recognize as reasonable.  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan J., concurring); *see California v. Ciraolo*, 476 U.S. 207, 213 (1986) (analyzing reasonableness of expectation of privacy under *Katz* two-prong test).

      In this case, Jackson was on parole at the time of the search and, as a condition of his parole, was required to sign the standard conditions of release form acknowledging that his person or residence could be searched.  (G. Ex. 1).  As a parolee, not only did Jackson relinquish some measure of liberty held by average citizens, but he in fact enjoyed "severely diminished expectations of privacy by virtue of [his] status alone."  *Samson v. California*, 547 U.S. at 849 ("parolees have fewer expectations of privacy than probationers because parole is more akin to imprisonment than probation is to imprisonment"); *see also United States v. Knights*, 534 U.S. at 119-120 (probationer's reasonable expectation of privacy is less than that of an ordinary citizen); *United States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) ("[a] parolee's reasonable expectations of privacy are less than those of ordinary citizens and are even less so where, as here, the parolee, as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer"), *cert. denied*, 127 S. Ct. 988 (2007); *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) ("parole justifies some departure from traditional Fourth Amendment standards").  A parolee's "expectation of privacy is further diminished where he has consented to a search condition."  *United States v. Jackson*, 663 F. App'x 31, 33 (2d Cir. 2016) (summary order).

      In addition, a state has a legitimate and "overwhelming" interest in closely monitoring its parolees.  *Samson*, 547 U.S. at 853 ("[t]his Court has repeatedly acknowledged that a State has an overwhelming interest in supervising parolees because parolees are more likely to commit future criminal offenses[;] [s]imilarly, this Court has repeatedly acknowledged

that a State's interests in reducing recidivism and thereby promoting reintegration and positive

citizenship among probationers and parolees warrant privacy intrusions that would not otherwise

be tolerated under the Fourth Amendment") (internal quotation and citations omitted).  "Searches

of [parolees] are necessary to the promotion of legitimate government interests based on the

State's dual interest in integrating [parolees] back into the community and combating

recidivism."  *United States v. Justiniano*, 401 F. App'x 595, 596 (2d Cir. 2010) (summary order).

Weighing these important interests, courts have concluded that searches that may be

unreasonable as to ordinary citizens may be reasonable as to parolees.  *Samson*, 547 U.S. at 853.

*Accord United States ex. rel. Santos v. New York State Bd. of Parole*, 441 F.2d 1216, 1218 (2d

Cir. 1971), *cert. denied*, 404 U.S. 1025 (1972) (citation omitted).

        In New York, the lawfulness of a particular warrantless parole search conducted

on less than probable cause has traditionally depended upon "whether the conduct of the parole

officer was rationally and reasonably related to the performance of the parole officer's duty,"

*People v. Huntley*, 43 N.Y. 2d 175, 181 (1977), – a standard that has been held coextensive with

the Fourth Amendment reasonableness standard.[7]  *United States v. Grimes*, 225 F.3d at 259 (the

reasonable relationship rule articulated in *Huntley* is "coextensive with the requirements of the

Fourth Amendment" because "the doctrine of 'special needs' permits those searches that are

reasonably related to the special needs animated by management of a parole system") (citation

omitted); *see United States v. Campbell*, 342 F. Supp. 3d 375, 390 (W.D.N.Y. 2018) ("[a]n

individual on supervised release has a "'significantly diminished' expectation of privacy, . . . and

---

[7]  The Second Circuit has yet to determine whether "the *Huntley* standard has been superseded by" the Supreme Court's decision in *Samson*, which affirmed a parole officer's suspicionless search of a California parolee's home.  *Black v. Petitinato*, 761 F. App'x 18, 21 (2d Cir. 2019) (summary order) (citing *United States v. Barner*, 666 F.3d 79, 86 (2d Cir. 2012) (declining to address whether search of a parolee's home "could have been justified under *Samson* … without … applying the *Huntley* standard")).  Here, the government has not advocated for application of a suspicionless standard, maintaining that the *Huntley* standard is satisfied in this case

as a result, the probable cause requirements of the Fourth Amendment do not generally apply to searches by probation officers in executing their supervisory duties consistent with search conditions imposed as a part of supervised release") (quoting *United States v. Lambus*, 897 F.3d 368, 402 (2d Cir. 2018)), *appeal filed*, No. 19-120 (2d Cir. 2019).  Under this standard, a parole officer may conduct a warrantless search where the officer has reasonable suspicion that a parolee subject to a search condition is engaged in criminal activity or activity that violates the conditions of his release.  *United States v. Jackson*, 663 F. App'x at 33; *United States v. Justiniano*, 401 F. App'x at 596 (residence search was rationally and reasonably related to parole officers' duties where officers conducting home visit saw empty beer box and encountered defendant's girlfriend and where defendant's parole conditions prohibited him from consuming alcohol and associating with girlfriend).  "In evaluating whether an officer had reasonable suspicion to justify a search, courts look to the 'totality of the circumstances' to determine whether the officer had a 'particularized and objective basis' to suspect the person searched of criminal [or otherwise violative] activity."  *Jackson*, 663 F. App'x at 33-34.

On the record developed through the evidentiary hearing, I conclude that Saben's search of Jackson's vehicle and Diamond's search of the unapproved phone were rationally related to the performance of their duties as parole officers and supported by reasonable suspicion.  Diamond testified that the purpose of his visits to Jackson's home were to "ensur[e] that [Jackson was] complying with [his] release conditions."  (Tr. A 19).  *See Newton*, 369 F.3d at 666 ("the obligation to detect and prevent parole violations so as to protect the public from the commission of further crimes is part of a parole officer's duty") (internal quotation omitted); *United States v. Reyes*, 283 F.3d 446, 459 (2d Cir.) (parole officers have duty "to investigate

whether a parolee is violating the conditions of his parole, . . . one of which, of course, is that the parolee commit no further crimes"), *cert. denied*, 537 U.S. 822 (2002).

Diamond had been supervising Jackson's compliance with parole conditions for more than one year when he conducted the early April 2018 unannounced home visit. The unusual circumstances of that visit, including the sounds Diamond heard after he knocked on the door, the length of time it took Jackson to answer the door, Jackson's unusual nervous demeanor, and Jackson's roommate's unprecedented entrance into Jackson's bedroom and positioning on the bed while Diamond was inside the room with Jackson, caused Diamond to suspect that Jackson might not be complying with his release conditions. To investigate Diamond's suspicions, Jackson was required to submit to a polygraph examination, which indicated that he was deceptive in answering three questions, one of which was whether he had viewed sexually explicit material. Knowing that such material is typically accessed over the internet on an electronic device, Diamond developed concerns that Jackson was viewing pornography on an unauthorized electronic device.

Based upon this information, Diamond decided to intercept Jackson outside his house in order to minimize the risk that Jackson's roommate would help to conceal any unauthorized electronic devices. When Jackson arrived in his car, Diamond observed him reach down towards the bottom of the driver's seat in an apparent attempt either to retrieve or to secrete something. I agree with the government that the totality of the circumstances from the early April home visit, the polygraph examination and later confrontation about its results, and Diamond's observations on May 7, 2018, provided reasonable suspicion to believe that Jackson was violating his parole conditions and thus permitted a warrantless search of his person and

property.[8]  *See Jackson*, 663 F. App'x at 34 ("[e]ven if each of these facts, viewed in isolation,

would not necessarily establish reasonable suspicion that [defendant] had become involved in

[criminal activity], when considered in the aggregate, they certainly do"); *United States v. Pope*,

2019 WL 7666528, *6 (W.D. Ky.) (voice stress test is appropriate supervisory tool that supports

finding of reasonable suspicion; "[i]t would make no sense to provide that [defendant] would be

subject to [the] examination as part of his supervision, and then hold that the results of that

examination were not a reliable basis for supervisory action"), *report and recommendation

adopted by*, 2019 WL 5068663 (W.D. Ky. 2019); *United States v. Harrison*, 2016 WL

11481716, *6 (E.D.N.Y.) (defendant's conduct, including lying, "evasive conduct during the

home visit, [and] his nervous demeanor, . . . in their totality, were sufficient to establish

reasonable suspicion to believe that [d]efendant was engaged in criminal activity that he wished

to hide from the probation officers"), *report and recommendation adopted by*, 2016 WL

1070816 (E.D.N.Y. 2016); *United States v. Beyers*, 2014 WL 4113324, *7 (W.D. Mo. 2014)

("[t]he positive use of polygraph examinations as part of probation conditions of sex offenders is

well-documented[;] [i]t would make no sense to routinely require such a condition, but then

---

[8]  The government has consistently argued that the parole searches of Jackson's car and phone were supported by reasonable suspicion.  (*See* Docket # 56 at 12 ("For Fourth Amendment purposes, Officer Diamond needed only reasonable suspicion to search the cellular telephone; it was property of the defendant subject to search via his parole conditions.")).  Although the government has appropriately noted that Jackson's parole conditions required him to "permit the search and inspection of [his] person, residence and property" (G. Ex. 1), the government does not appear to rely upon the doctrine of consent as independent justification for the searches.  For example, the government has not addressed Jackson's contention in his affidavit that he did not provide consent for the searches, nor has the government cited authority addressing the consent doctrine's applicability in circumstances such as those presented here: the parole conditions provide that the parolee shall permit searches of his property; the parole officer does not explicitly request permission to conduct the challenged search; but, the parolee does not explicitly object to the search.  *See, e.g.*, *United States v. Bennett*, 2005 WL 2709572, *9 (W.D.N.Y. 2005) ("[t]he [c]ourt agrees that the search condition to which the defendant consented on August 1, 2003 cannot, standing along[,] establish a valid consent search on January 15, 2005[;] [h]owever, the fact that the defendant agreed to that condition on August 1, 2003 to obtain his release on parole does not preclude a valid consent to search on his part on January 15, 2005").  Because the issue of consent is not developed by the government and not directly before the Court, I do not address it.

conclude that a probationer's responses are meaningless"); *United States v. Coulombe*, 2007 WL 4192005, *5 (N.D.N.Y. 2007) ("[w]hile no single factor is dispositive, courts have sometimes focused on certain factors that are especially probative, including a [defendant's]: lies and false information; implausible, conflicting, evasive or unresponsive answers; and nervous behavior or demeanor").

I also conclude that when the unapproved phone was discovered under the driver's seat of the car that Jackson was driving, Diamond and Saben were justified in searching Jackson's vehicle and the unapproved phone for evidence of criminal activity and further violations, including possession of images of child pornography and/or contact with minors for illicit purposes. *See Justiniano*, 401 F. App'x at 596 ("the clear parole violations observed by the officers here upon entering [the defendant']s residence provided sufficient reasonable suspicion to conduct a further search for additional contraband"); *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (reasonable suspicion to search computer existed based on defendant's prior convictions, prior incidents of unsupervised accessing of the internet, delay in opening door, nervous demeanor, and observation of an unauthorized connection to the computer); *United States v. McGill*, 2018 WL 1411123, *10 (N.D. Ill. 2018) ("the failed polygraph tests provided [the parole officer] independent information that [defendant] may have violated his conditions such that when he observed the unmonitored phone, he had reasonable suspicion to believe it was evidence of a potential violation"); *United States v. Harrison*, 2016 WL 11481716 at *7 ("[o]nce discovering the firearm, the possession of which was, in and of itself, illegal and yet another violation of [d]efendant's release conditions, . . . the probation officers had additional reasonable suspicion to conduct a more exhaustive search of the remainder of [d]efendant's apartment and his vehicle"). That reasonable suspicion was grounded

not only in Jackson's possession of an unapproved phone and efforts to conceal it, but in Diamond's knowledge of Jackson's prior conviction for sexual abuse involving a minor and his noted deception in the polygraph concerning whether he had viewed sexually explicit images.

### B.      Compelled Use of Biometric Features and Inevitable Discovery

I turn finally to Jackson's challenge to the manner in which Diamond unlocked the phone.  Specifically, Jackson contends that Diamond violated his Fourth and Fifth Amendment rights by compelling him to unlock the phone with his facial features.  He also maintains that Diamond violated his Fifth Amendment rights by compelling him to provide the phone's passcode.  The government counters that the manner in which the phone was unlocked did not violate Jackson's rights but, even if it did, the government would inevitably have unlocked and searched the phone.  The government also argues that the incriminating evidence, which was located on the SD card and not the phone, was not protected by facial recognition software or a passcode and would inevitably have been discovered.

Considering the relative novelty of facial recognition software, the paucity of authority addressing constitutional issues arising therefrom is unsurprising.  *See*, *e.g.*, *In re Search of [Redacted] Washington, D.C.*, 317 F. Supp. 3d 523 (D.D.C. 2018) (addressing constitutional implications of compelled use of biometric features to unlock electronic devices).  This Court need not wade into these murky waters in this case because the record demonstrates that the contents of the unapproved phone and the SD card would inevitably have been searched even without the use of Jackson's face or the passcode he provided.

The inevitable discovery exception to the exclusionary rule "allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless 'if the prosecution can establish by a preponderance of the evidence that the information ultimately

or inevitably would have been discovered by lawful means.'"  *United States v. Whitehorn*, 829

F.2d 1225, 1230 (2d Cir. 1987) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)), *cert.*

*denied*, 487 U.S. 1237 (1988).  In applying this exception, the court must determine, "viewing

affairs as they existed at the instant before the unlawful search, what *would have happened* had

the unlawful search never occurred."  *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992).

"[P]roof of inevitable discovery 'involves no speculative elements but focuses on demonstrated

historical facts capable of ready verification or impeachment and does not require a departure

from the usual burden of proof at suppression hearings.'"  *Id.* (emphasis omitted) (quoting *Nix v.*

*Williams*, 467 U.S. at 444).  As the Supreme Court explained in *Nix*:

> [T]he interest of society in deterring unlawful police conduct and
> the public interest in having juries receive all probative evidence of
> a crime are properly balanced by putting the police in the same, not
> a worse, position that they would have been in if no police error or
> misconduct had occurred.

*Nix*, 467 U.S. at 443.

The hearing testimony demonstrates that even if Diamond had been unable to

access the unapproved phone on May 8, 2018, he would have seized it and the SD card in it and

provided them to Harrington to conduct a forensic search.  Diamond credibly testified that he

always seized any unapproved electronic device found in the possession of any parolee whom he

supervised.  (Tr. B 12-14).  He also testified credibly that he would have provided the phone to

Harrington for a forensic review even if he had not been able to access it with Jackson's

compelled assistance.  (Tr. B 5-7, 15).

The witnesses' hearing testimony further demonstrates that the scope of

Harrington's examination was not affected by Diamond's search of the phone on May 8, 2018.

(Tr. B 43).  Harrington testified that even if Diamond had not provided him with specific

directions to review the contents for social media use, he would have searched the phone and card in the same manner, including searching for pornographic material. (*Id.*). The incriminating evidence was not found on the phone, but was discovered on the SD card, which was not protected by a passcode.[9] (Tr. B 24-26). On this record, I find that the evidence which Jackson seeks to suppress would have been discovered even if Jackson had not been compelled to provide the passcode to the phone or present his biometric features to unlock the phone. *See United States v. Todd*, 2017 WL 1197849, *13 (S.D. Ga.) ("as [the agent] testified, [the] FBI offices . . . had the technological capabilities to bypass the swipe pattern and access the contents of [d]efendant's cell phone[;] [t]hus, regardless of whether officers violated [d]efendant's *Miranda* rights in obtaining [d]efendant's swipe pattern, the inevitable discovery doctrine prevents suppression of the evidence attained from the cell phone search"), *report and recommendation adopted by*, 2017 WL 1172113 (S.D. Ga. 2017); *United States v. Will*, 2015 WL 3822599, *16 (N.D. W. Va. 2015) (suppression not warranted under doctrine of inevitable discovery where evidence demonstrated content of phone would have been extracted without password).

---

[9] Whether Harrington would have been able to access the contents of the phone without the passcode on May 10, 2018, is not dispositive because (1) the incriminating evidence was not contained on the phone but on the SD card, and (2) Harrington testified the software he uses is frequently updated and currently enables him to access the same model phones as the unapproved phone. (Tr. B 24-26, 31-33, 40). *See United States v. Orozco Ramirez*, 2019 WL 2165920, *9 n.10 (N.D. Ga.) ("[i]n this case, the government would have inevitably discovered the evidence on the cell phone[;] [although] [a]t the time that the [g]overnment first came into possession of the cellphone and [was] authorized to search it, the software necessary for the search was not available[,] [w]ithin several months, . . . the updated software tools became available"), *report and recommendation adopted by*, 2018 WL 8337421 (N.D. Ga. 2019).

## <u>CONCLUSION</u>

For the reasons explained above, I recommend that the district court grant Jackson's motion to suppress statements made on May 7, 2018, deny as moot his motion to suppress statements made on June 11, 2018, and deny his motion to suppress evidence. **(Docket # 38)**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      February 19, 2020

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[10]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


                                                    *s/Marian W. Payson*
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge


Dated: Rochester, New York
       February 19, 2020

---

[10]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).